In the Matter of the Arbitration Between **TEMPO SHAIN CORPORATION; Neptune Plus Corporation, Petitioners–Appellees,**

v.

**BERTEK, INC., Respondent–Appellant.**

**No. 1460, Docket 96–9471.**

United States Court of Appeals, Second Circuit.

Argued Jan. 27, 1997.

Decided July 21, 1997.

Michael C. Silberberg, New York City (Edward M. Spiro, Jessica R. Bernanke, Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., New York City, of counsel), for Respondent–Appellant.

Sheldon Eisenberger, New York City (Daniel J. Cooper, The Law Office of Sheldon Eisenberger, New York City, of counsel), for Petitioners–Appellees.

Before: WALKER, PARKER and HEANEY,* Circuit Judges.

PARKER, Circuit Judge:

Neptune Plus Corporation ("Neptune"), an affiliate of Tempo Shain Corporation ("Tempo Shain"), entered into an agreement with Bertek, Inc. ("Bertek") to purchase a license agreement from Gelman Sciences, Inc. ("Gelman") for a patented process to treat materials to enhance their repellency characteristics. Under the agreement, Bertek was to manufacture the treated material, which Neptune intended to sell to the apparel and footwear industries. Disagreements arose and the parties entered arbitration to resolve claims brought by Neptune against Bertek for fraudulent inducement to contract and breach of contract. Bertek counterclaimed with its own fraudulent inducement and breach of contract charges.

Bertek intended to call Wayne Pollock, former President of Bertek's Laminated Products Division, as a witness to provide what Bertek considered to be crucial testimony concerning the negotiations and dealings between the parties about which it claims only Pollock could testify. Pollock became temporarily unavailable to testify, however, after his wife was diagnosed with a recur-

---

* The Honorable Gerald W. Heaney, United States Circuit Judge for the Eighth Circuit, sitting by designation.

rence of cancer. The arbitration panel was advised that Pollock remained willing to testify, but that the expected duration of his unavailability was indeterminate. Bertek urged the panel to keep the record open until Pollock could testify either in person or by deposition.

After deliberation, the panel concluded the hearings without waiting for Pollock's testimony. The arbitrators stated:

> We as arbitrators have to decide does Mr. Pollock have any information that if he was here in person and you fellows are banging him with questions that some new information comes out that we haven't heard or is it going to be a rehash of what we've heard from other witnesses.

The panel subsequently rendered an award in favor of Tempo Shain and Neptune, and denied Bertek's counterclaims. Appellees petitioned the United States District Court for the Southern District of New York pursuant to sections 9 and 10 of the Federal Arbitration Act ("FAA" or "Act"), 9 U.S.C. §§ 9–10 (West 1970 & Supp.1997), to confirm the arbitration award. Bertek cross-moved to vacate the award, arguing that the arbitrators were guilty of misconduct pursuant to FAA section 10(a)(3), 9 U.S.C. § 10(a)(3). Appellees filed an opposition to Bertek's motion to vacate. In response, Bertek filed surreply papers, which included an affidavit from Pollock stating what he would have testified to, if permitted. The district court (Loretta A. Preska, *Judge* ) granted the petition to confirm the arbitration award and denied the motion to vacate. *Tempo Shain Corp. v. Bertek, Inc.*, No. 96 Civ. 3354 (S.D.N.Y. Oct. 24, 1996). In granting a later request by Bertek to add Pollock's affidavit to the record on appeal, the court noted that it had considered Pollock's affidavit when it made its decision. The court's endorsement order was based on its conclusion that the arbitration panel correctly understood that it was required to decide whether Pollock's testimony would add to the panel's knowledge about the case or simply be repetitive, and that the panel made its decision accordingly. *Tempo Shain*, No. 96 Civ. 3354, at 2. Bertek appealed.

The question on appeal is whether the panel's refusal to continue the hearings to allow Pollock to testify amounts to fundamental unfairness and misconduct sufficient to vacate the arbitration award pursuant to section 10(a)(3) of the Act. We believe that it did, and therefore vacate the court's endorsement of the award.

## I. BACKGROUND

On March 11, 1994, Neptune and Bertek entered into an agreement (the "Agreement") whereby Neptune was to acquire a license from Gelman to use the "Repel Process" and Bertek agreed to perform laminating and other processing of materials for Neptune. The Repel Process is a patented methodology used to treat materials to enhance their repellency of water, oil, and other solvents. Understating its complexity, the Repel Process is essentially a two-step process. First, laminated material is coated with repellent chemicals. Then the treated material is cured by using ultraviolet lights, which act as a catalyst for a chemical reaction that creates unique chemical resistance and a higher degree of waterproofness. Neptune intended to sell the processed material to the footwear and apparel industries.

Prior to the Agreement, Gelman had been successfully applying the Repel Process to produce material for Neptune. However, the material must be laminated before the Repel Process is applied, and Gelman could not perform laminating on-site. More importantly, Neptune desired sixty-inch wide material, and Gelman could only perform the Repel Process on material up to forty inches in width because of the physical limitations of its ultraviolet curing system. Curing is an essential stage of the Repel Process.

According to its marketing brochure, Bertek is a multi-service production company offering research and development and manufacturing capabilities, with particular expertise in producing drug-delivery systems, wound care products, and other health care products and materials. The company provides facilities for customers to run their own production, or provides production services for customers who do not wish to do so. Additionally, and relevant to Neptune's

needs, Bertek has expertise in lamination, curing, and machinery design and building. Under the Agreement, Bertek was to perform both the lamination and the Repel Process on the material to be sold to Neptune's customers (together, these processes were referred to as the "Neptune Plus Process"). The Agreement also specified that Bertek was responsible for purchasing and moving the necessary equipment for the Repel Process from the Gelman facility to its own location.

The Agreement provided that the equipment and related material for the Repel Process would be moved from Gelman at a later date, on or about March 15, 1994, and should be ready for production runs by May 1, 1994, but allowed for a reasonable time variance to "iron out operational problems relating to start up of the Equipment." Under the Agreement, Neptune also agreed to provide one of its employees to Bertek through May 31, 1994 to assist in set-up and training on the equipment. The equipment was, in fact, not up and running at Bertek until July 1994. However, Bertek performed laminating for Neptune prior to the time that the Repel equipment was ready to be utilized.

Several disagreements arose relating to moving and setting up the Repel equipment, and to Bertek's inability to meet purchase order specifications for the material. In fact, Bertek was never able to produce either laminated or repelled material to Neptune's satisfaction. On March 9, 1995, the parties entered into an agreement intended to resolve their disputes ("1995 Agreement"). The new agreement allowed for transfer of the lamination process to another laminator, although the parties reserved the claims resulting from the dispute under the initial Agreement. Under the 1995 Agreement, the laminated material was still shipped to Bertek for application of the Repel Process. The problems continued, and on July 11, 1995, Tempo Shain and Neptune filed a formal demand for arbitration alleging that Bertek had fraudulently induced them to enter into the agreements and then breached them, causing Neptune at least $2,000,000 in damages. Bertek counterclaimed that *it* had

been fraudulently induced to enter into the agreements which Neptune then breached.

## II. DISCUSSION

The district court confirmed the arbitration award based on its conclusion that the arbitration panel correctly understood that it was required to decide whether Pollock's testimony would add to the panel's knowledge or merely be a cumulative "rehash" of what the panel had already heard from other witnesses. *Tempo Shain,* No. 96 Civ. 3354, at 2–3. The court noted:

"The granting or denying of an adjournment falls within the broad discretion of appointed arbitrators." *Storey v. Searle Blatt, Ltd.,* 685 F.Supp. 80, 82 (S.D.N.Y. 1988); *see Concourse Beauty School, Inc. [v. Polakov Design and Construct. of South Florida, Inc.],* 685 F.Supp. [1311,] 1318 [ (S.D.N.Y.1988) ]. It has long been recognized that "Arbitrators must be given discretion to determine whether additional evidence is necessary or would simply prolong the proceedings." *Catz American Co., Inc. v. Pearl Grange Fruit Exchange, Inc.,* 292 F.Supp. 549, 553 (S.D.N.Y.1968).

*Tempo Shain,* No. 96–3354, at 2.

The district court was correct that arbitration panel determinations are generally accorded great deference under the FAA. Judicial review of arbitration awards is necessarily narrowly limited. *Ethyl Corp. v. United Steelworkers of America, AFL–CIO–CLC,* 768 F.2d 180, 183 (7th Cir.1985). Undue judicial intervention would inevitably judicialize the arbitration process, thus defeating the objective of providing an alternative to judicial dispute resolution. *See id.* at 183–84.

Federal courts may vacate an arbitration award only in limited circumstances as proscribed by section 10(a) of the Act, 9 U.S.C. § 10(a). Section 10(a)(3) provides that a federal court may vacate an arbitration award if "the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy[,] or of any other misbehavior by which the rights of the party have been

20

prejudiced." 9 U.S.C. § 10(a)(3). In this case, we are primarily concerned with whether the arbitration panel committed misconduct in refusing to hear evidence pertinent or material to the controversy.

■ Courts have interpreted section 10(a)(3) to mean that except where fundamental fairness is violated, arbitration determinations will not be opened up to evidentiary review. In making evidentiary determinations, an arbitrator "need not follow all the niceties observed by the federal courts." *Bell Aerospace Co. Div. of Textron v. Local 516*, 500 F.2d 921, 923 (2d Cir.1974). However, although not required to hear all the evidence proffered by a party, an arbitrator "must give each of the parties to the dispute an adequate opportunity to present its evidence and argument." *Hoteles Condado Beach v. Union De Tronquistas Local 901*, 763 F.2d 34, 39 (1st Cir. 1985). "Federal courts do not superintend arbitration proceedings. Our review is restricted to determining whether the procedure was fundamentally unfair." *See Teamsters, Local Union 657 v. Stanley Structures, Inc.*, 735 F.2d 903, 906 (5th Cir.1984); *accord Concourse Beauty School, Inc. v. Polakov*, 685 F.Supp. 1311, 1318 (S.D.N.Y.1988) ("The misconduct must amount to a denial of fundamental fairness of the arbitration proceeding in order to warrant vacating the award." (quoting *Transit Cas. Co. v. Trenwick Reinsurance Co.*, 659 F.Supp. 1346, 1354 (S.D.N.Y.1987), *aff'd mem.*, 841 F.2d 1117 (2d Cir.1988))).

■ We find that there was no reasonable basis for the arbitration panel to determine that Pollock's omitted testimony would be cumulative with regard to the fraudulent inducement claims. Said differently, the panel excluded evidence plainly "pertinent and material to the controversy," 9 U.S.C. § 10(a)(3). The panel did not indicate in what respects Pollock's testimony would be cumulative, but stated that there were "a number of letters in the file" and that Pollock was "speaking through the letters [he wrote], and the reports he[ ] received." These letters and reports were not specifically identified by the arbitration panel. However, after a review of the record, it appears that the letters are correspondence between Pollock and Neptune's President, Robin Delaney, which the panel dubbed the "fight letters," and the reports are certain progress and accounting reports which were the basis for many of these fight letters. These so-called fight letters and reports are not at all representative of what Pollock's testimony would likely have been in connection with the fraudulent inducement allegations. The fight letters arose from individual problems that were ongoing at the time, and did not devolve into recriminations about earlier representations. Their focus was not on the inducement to enter the contracts—rather, they were attempts to solve problems which were giving rise to disputes. As Delaney explained, the parties were trying "[t]o keep the relationship going." The reports, like the letters, addressed discrete problems and possible courses of action. While the letters and reports might have been sufficient to represent what Pollock would have testified to in rebuttal of Neptune's breach of contract claims, which we do not decide, there is nothing to suggest that Pollock's intended testimony concerning appellees' fraudulent inducement claim and Bertek's counterclaim for fraudulent inducement was addressed by the documents admitted into evidence.

Because Bertek's alleged misrepresentations were not documented, appellees' unsupported oral testimony concerning such representations was unrebutted because Pollock, who allegedly made the representations on Bertek's behalf, was not allowed to testify, and he is the only person who could have done so.

As for Bertek's counterclaim for fraudulent inducement, Bertek contends, and there was no evidence to the contrary before the arbitration panel, that Pollock was the only individual involved in the negotiation of the contract with Neptune on Bertek's behalf. Pollock was identified several times throughout the testimony as Bertek's exclusive pointman in the negotiations. Neptune's Robin Delaney admitted this in her testimony. When asked to describe who was involved in the negotiations on each side, she responded: "Mainly it was just Wayne Pollock and myself and our attorneys."

On appeal, appellees contend that Pollock's secretary, Janine Silvey, was also involved in the negotiations. There is no evidence in the record to support the contention that Ms. Silvey was involved throughout the entire negotiations. There is also an open fact question as to whether Ms. Silvey's involvement was limited to providing administrative support, or whether she was aware to the same extent that Pollock was of the scope and implication of the representations and events leading to the execution of the agreements. Because Pollock as sole negotiator for Bertek was the only person who could have testified in rebuttal of appellees' fraudulent inducement claim, and in support of Bertek's fraudulent inducement claim, and the documentary evidence did not adequately address such testimony, there was no reasonable basis for the arbitrators to conclude that Pollock's testimony would have been cumulative with respect to those issues.

■ Finally, we disagree with appellees' contention that Pollock's intended testimony about the period pre-dating the Agreement is immaterial because a merger clause contained in the Agreement makes the pre-contract period irrelevant to the evaluation of Bertek's failure to perform. A general merger clause does not preclude parol testimony where a claim is based on fraud in the inducement.

■■ Ordinarily, a merger clause provision indicates that the subject agreement is completely integrated, and parol evidence is precluded from altering or interpreting the agreement. However, because "the parol evidence rule rests on the rationale that a later written agreement has supplanted prior negotiations, it follows that the rule does not come into play until the existence of an enforceable written agreement has been shown."[1] "[S]ince the rule assumes a valid written agreement, it does not exclude evidence to show that there was no agreement or that the agreement was invalid."[2] The merger clause cannot preclude such a showing since the effectiveness of the clause itself depends on its being part of a valid agreement. Thus, the parol evidence rule does not exclude evidence to show misrepresentation.[3]

## III. CONCLUSION

On the facts of this case, the panel's refusal to continue the hearings to allow Pollock to testify amounts to fundamental unfairness and misconduct sufficient to vacate the award pursuant to section 10(a)(3) of the FAA. For the reasons stated above, we vacate the district court's endorsement of the arbitration award and remand for further proceeding consistent with this opinion.

---

1. E. Allan Farnsworth, *Contracts*, § 7.3, at 480 (2d ed.1990) (footnotes omitted).

2. *Id.* § 7.3, at 479.

3. *See* Restatement Second of Contracts § 214 (1981).